# In the United States Court of Federal Claims

No. 08-676
(Filed: October 28, 2010)

* * * * * * * * * * * * * * * * * * * * * *

AMERICOPTERS, LLC,

                       *Plaintiff*,

v.

THE UNITED STATES,

                       *Defendant*.

Fifth Amendment Taking; authorization; agency authority; internal delegation of agency authority; scope of employee's authority; ratification.

* * * * * * * * * * * * * * * * * * * * * *

    *Roger J. Marzulla* and *Nancy G. Marzulla,* Washington, D.C., for plaintiff.

    *Austin M. Fulk*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Tony West*, Assistant Attorney General, *Jeanne Davidson*, Director, and *Mark A. Melnick*, Assistant Director, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    Plaintiff seeks compensation under the Fifth Amendment of the United States Constitution for the alleged taking of its business due to the actions of the Federal Aviation Administration ("FAA"). Currently before the court are defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment on liability, both pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). These motions present the question of whether a Fifth Amendment taking occurs when the action allegedly causing the taking is within the agency's authority but where, as here, the individual employees performing the action were not authorized

to act.  For the reasons explained below, we hold that as a matter of law, the undisputed facts do not give rise to a compensable taking.  Accordingly, we grant the government's motion for summary judgment.

FACTUAL BACKGROUND[1]

In the years leading up to 2002, Americopters, LLC ("Americopters") operated a helicopter tour business in Guam.  Americopters' helipad was located on the roof of a restaurant.  In February of 2002, Mr. Clarence Kanae, the Principal Operations Inspector for the FAA's Flight Standards District Office in Honolulu, Hawaii, conducted an inspection of Americopters' facility. During the course of his inspection, he orally identified a number of deficiencies in Americopters' operation.

Following this visit, Americopters wrote to Mr. Kanae, listing the improvements Americopters planned to make and asking him to confirm and clarify the deficiencies he had noted.  After several weeks passed without any response, Americopters faxed the letter to Mr. Kanae's Honolulu office. Americopters subsequently re-faxed the letter several times, but received no response.  Four months after the inspection, on July 24, 2002, Americopters received a letter from Mr. Kanae requiring Americopters to immediately cease use of its rooftop heliport:

> This letter is to inform you that the use of the rooftop as a helicopter-pad, at Chuck's Steak House, is considered unsafe, and does not meet the Federal Aviation Administration Advisory Circular 150-5390-2A Heliport Design requirements.  This [Advisory Circular] is Advisory in nature; however, this office feels that FAR[2] 91.13 will apply to this operation if the AC is not followed.  Therefore, this office is requiring that your

---

[1] These facts are drawn from the parties' Proposed Findings of Uncontroverted Fact and are undisputed unless otherwise noted.

[2] Here, the "FAR" refers to the Federal Aviation Regulations, found in Title 14 of the Code of Federal Regulations, not the similarly abbreviated Federal Acquisition Regulation.  Section 91.13 states that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."  14 C.F.R. § 91.13 (2010).

> company immediately cease use of the Chuck's Steak House
> rooftop for all flight operations.

Def.'s Mot. for Summ. J. Ex. 1.  Although written by Mr. Kanae, this letter
was edited and approved by his supervisor, Don Hamilton, who signed it
because Mr. Kanae was out of the office.  It was Mr. Hamilton, in fact, who
added the final sentence requiring Americopters to cease operating.  Although
the FAA is statutorily authorized to promulgate and enforce air safety
regulations, under the FAA's internal organization and policies, neither Mr.
Kanae nor Mr. Hamilton were authorized to issue an order such as this.

Upon receipt of the letter, Americopters relocated its business to what
it characterizes as a less favorable location where the volume of customers
declined dramatically.  As a result of the relocation, Americopters alleges that
it was forced to sell one of its helicopters at a loss and ultimately to shutter its
operation entirely.

In response to Mr. Kanae's letter, Americopters' counsel wrote the
FAA on August 13, 2002, requesting a rescission of the "cease operations"
order, confirmation that improvements it proposed would rectify the helipad's
deficiencies, and 90 days to perform these improvements.  In the alternative,
the letter requested a hearing under 14 C.F.R. § 13.20(c).  The FAA's Regional
Counsel, Monroe Balton, replied on September 19, 2002, denying
Americopters' request for a hearing because no legal enforcement action had
been taken against Americopters.  The regional office, in effect, disavowed
Mr. Kanae's letter, noting that under FAA regulations only certain FAA
attorneys have authority to issue "orders of compliance, cease and desist
orders, orders of denials, and other orders."  Def.'s Mot. for Summ. J., Ex. 4.
"No such orders were issued with respect to . . . Americopters['] flights using
the Chuck's Steakhouse heliport."  *Id.*  Because Mr. Kanae's letter was not "an
order as that term is contemplated by the [FAR] . . . your requests are denied."
*Id.*

Its administrative remedy thus denied, Americopters filed suit in the
United States District Court for the District of Guam in February of 2003,
seeking rescission of the alleged FAA orders and arguing that Mr. Kanae's
purported order dated June 24, 2002, was a taking of Americopters' property.
The FAA moved to dismiss the complaint, relying on 49 U.S.C. § 46110
(2006), which vests jurisdiction to hear challenges to FAA orders in the circuit

courts of appeal.[3]  The district court determined that Mr. Kanae's letter was an order and that § 46110 thus deprived the court of jurisdiction.  The district court also dismissed Americopters' constitutional claim, holding that, although not directly preempted by § 46110, it was "inescapably intertwined" with the claims being dismissed.

Americopters appealed the dismissal to the Court of Appeals for the Ninth Circuit, which dismissed its petition for review of the order as untimely because it was not filed within the 60-day statutory period.[4]  The Ninth Circuit determined that Americopters' constitutional claims, however, were not so intertwined with the challenged FAA order to defeat the district court's jurisdiction.  Accordingly, it reversed the dismissal of those claims and remanded them to the district court for further proceedings.

On remand to the district court, the FAA moved to dismiss or, in the alternative, to transfer the case to this court.  The district court transferred the case here, and Americopters appealed the transfer to the Court of Appeals for the Federal Circuit.  The Federal Circuit upheld the transfer, and on November 18, 2008, Americopters filed an amended complaint alleging that the FAA's actions had caused the loss of its business.  Early in 2009, the government moved to dismiss the case, arguing that Mr. Kanae was not authorized to issue cease-and-desist orders and that an unauthorized government action cannot constitute a taking.  We denied the motion and directed the parties to conduct limited discovery concerning the scope of Mr. Kanae's authority.  On March 3, 2010, the government again moved for summary judgment, arguing that Mr. Kanae's shutdown order was unauthorized and thus no basis for a takings claim.  Americopters cross-moved for summary judgment as to liability.

---

[3] Although the FAA had previously argued that Mr. Kanae's letter was not a final order, it persuaded the district court that, because the complaint alleged the order was final, the court was required to dismiss the case.  On appeal, the Ninth Circuit noted the "procedural limbo or netherworld" into which the case had fallen, largely as a result of the FAA's inconsistent positions regarding the finality of the order at issue.  *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 730 (9th Cir. 2006).

[4] The relevant jurisdictional statute states in pertinent part that a "petition must be filed not later than 60 days after the order is issued."  49 U.S.C. § 46110(a).

## REGULATORY BACKGROUND

By statute, the FAA Administrator has power to promulgate regulations dealing with aviation safety, 49 U.S.C. § 106 (2006), and to conduct investigations and issue orders necessary to carry out this power, 49 U.S.C. § 40113 (2006). The administrator can delegate the authority to carry out these powers. 49 U.S.C. § 106. Pursuant to this authority, the FAA has established an organizational framework, a scheme of safety regulations, and a system for enforcing them. At the time of the events in this case, the enforcement scheme was set forth in FAA Order 2150.3A,[5] which spelled out the responsibilities of various offices and described the roles of particular types of employees.

Enforcement of safety regulations is carried out within a chain-of-command based on geographic area. FAA Order 2150.3A § 208(a). At the lowest level are field offices, such as that in which Mr. Kanae and Mr. Hamilton worked, which are responsible for investigating violations within their territory:

> Field offices conduct surveillance inspections of persons, aircraft, or operations subject to the regulations to determine compliance with the regulations and any lack of qualifications, and investigate, coordinate, and report violations of all regulations which are discovered within the geographical area for which they have enforcement responsibility.

*Id.* § 305. These responsibilities are carried out by inspectors such as Mr. Kanae. As an Aviation Safety Inspector and Principal Operations Inspector, his role is to "gather facts, evidence, and documents, to analyze that information, and to make recommendations concerning enforcement actions." *Id.* § 401. His job is to investigate violations and document his findings in a report known as an Enforcement Investigation Report ("EIR"). The EIR "is the means for documenting, assembling, organizing, and presenting all evidence and other pertinent information obtained during an investigation," *id.* § 900(a), and includes information about the type of action recommended or taken. *Id.* § 903(c)(25).

---

[5] This order has since been superceded by a new version, but is still available for viewing at the FAA's online Regulatory and Guidance Library. *See* http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgOrders.nsf/key/Order%202150.3A.

In cases of relatively minor violations, inspectors are permitted to take administrative enforcement actions. *Id.* § 1100. Unlike legal enforcement actions, administrative actions do not charge the operator with a violation but are merely "intended to bring the incident to the attention of the person involved, document corrective action, encourage future compliance with the regulations, and provide a source of information for agency use." *Id.* § 1101. Inspectors are given discretion in determining when administrative action is appropriate:

> Once the underlying noncompliance is corrected, responsibility for selection of the enforcement remedy that best fits the circumstances begins with FAA personnel who investigated the case. In most cases, they are in the best position to evaluate various factors, such as the alleged violator's compliance attitude and whether an alternative to legal enforcement action may be sufficient to achieve compliance.

*Id.* § 204(a)(2).

There are two types of administrative enforcement actions: "warning notices" and "letters of correction." *Id.* § 1102. A warning notice, as the name would imply, warns an alleged violator of his error and "requests future compliance with the regulations." *Id.* § 1103(a). A letter of correction is similar but is used "when there is agreement with the [violator] that corrective action acceptable to the FAA has been taken, or will be taken, within a reasonable time." *Id.* § 1104. A letter of correction "should not be used to forward suggestions and recommendations by themselves; its sole purpose is to correct conditions which are in violation of the FAR." *Id.* § 1104(c). Neither a letter of correction nor a warning notice, however, are considered orders.

After a field office prepares an EIR, it is passed up the chain to the regional office. *Id.* §§ 1001-02. EIRs that merely report an administrative enforcement action are subject to a simple review "for internal purposes." *Id.* § 1001(b). The only change the regional office may make to such an EIR is to check and, if necessary, correct the citation to the regulation allegedly violated. *Id.*

In contrast, EIRs that recommend legal enforcement action are processed quite differently. Upon receipt of an EIR recommending legal enforcement action, the regional division reviews the file to determine that the

6

investigation is adequate, the report is legally and technically correct, and the recommendation is appropriate. *Id.* § 1002(b)(1)(A)-(C). If the regional division agrees with the field office's recommendations, it forwards the EIR to the Assistant Chief Counsel.[6] *Id.* § 1002(b)(2). Upon receipt of the EIR, the Assistant Chief Counsel reviews the file, examining the sufficiency of the evidence and the appropriateness of the sanctions recommended, before recommending legal enforcement action. *Id.* § 1002(c).

Among the types of legal enforcement actions available to the Assistant Chief Counsel are various orders, including cease and desist orders. Such orders, however, may only be issued by the Chief Counsel, the Deputy Chief Counsel, and each Assistant Chief Counsel and must provide for notice to the alleged violator and an opportunity for a formal hearing before final issuance of the order. *Id.* § 1209(b). There is no dispute that, under the FAA's enforcement scheme and organizational hierarchy, neither Mr. Kanae nor Mr. Hamilton had the authority to issue cease and desist orders.

## DISCUSSION

We have jurisdiction under the Tucker Act, which gives this court exclusive jurisdiction over Fifth Amendment takings claims against the United States for amounts greater than $10,000. *See* 28 U.S.C. § 1491 (2006); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1383 n.10 (Fed. Cir. 2000) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000.")).

Americopters does not, and cannot, challenge the propriety of the shutdown order here. *See Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("[I]n a takings case we assume that the underlying governmental action was lawful."); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 899 (Fed Cir. 1986) (holding that plaintiff's election of a Tucker Act suit, without previously testing the validity of the agency action, assumes the

---

[6] If the regional division disagrees with some aspect of the EIR's recommendation, it may return the EIR to the field office with instructions for further investigation, seek the advice of counsel, close the case, or forward the EIR to the Assistant Chief Counsel with comments and recommendations. FAA Order 2150.3A § 1002(b)(3)-(7).

validity of the action).[7]  Rather, Americopters' suit must assume the legitimacy of the agency's action and allege, on that basis, that the FAA's actions caused a taking in violation of the Fifth Amendment.  The issue presented by these cross-motions raises no genuine issues of material fact and is thus appropriate for summary judgment.

I.      THE APPROPRIATE LEGAL RULE

        The Fifth Amendment states in pertinent part, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend V.  Compensable takings include both physical takings, in which the government physically invades or appropriates private property, and regulatory takings, in which government regulations unduly burden private property to the point of diminishing its utility or value.  *See Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1378 (Fed. Cir. 2008).  Although Americopters' amended complaint does not specify, its claim here seems best construed as a regulatory taking.  *See Jan's Helicopter Servs., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1301 (Fed. Cir. 2008) (construing this case and another directly related to it as alleging regulatory takings).

        The sole question presented by the cross-motions is whether Mssrs. Kanae's and Hamilton's actions were authorized sufficiently for purposes of the takings clause to form the basis for a compensable taking.   "A compensable taking arises only if the government action in question is authorized."  *Del-Rio Drilling Programs, Inc., v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (citing *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920)); *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 898 (Fed. Cir. 1986) ("The Tucker Act suit in the Clams Court is not, however, available to recover damages for unauthorized acts of government officials.") (citations omitted).

---

        [7] In contrast, *Lion Raisins v. United States,* 416 F.3d 1356 (Fed. Cir. 2005), held that a plaintiff may not bring a takings claim to challenge a regulatory action when there is a comprehensive administrative and judicial scheme for challenging the action.  We note, however, that in *Lion Raisins* and its progeny, the administrative and judicial schemes at issue provided for the possibility of reimbursement.  Apart from this distinction, *Lion Raisins's* rule would routinely deprive us of jurisdiction over takings cases.

Both parties recognize the authority requirement, citing dozens of cases, but they disagree over how precisely it is applied on these facts. The government argues that it applies at an individual level: "the action that resulted in the alleged taking must have been an action that the Government official performing it was authorized to perform." Def.'s Mot. for Summ. J. at 5. Americopters, however, argues that the cases turn on "whether or not the act causing the taking was within the authority granted the *agency* by Congress." Pl.'s Resp. and Cross-Mot. at 12 (emphasis added). This distinction—between the agency's authority and that of an individual employee—is critical here, because the FAA undoubtedly has the authority to regulate and even suspend flight operations, but that authority has been delegated only to certain employees and not others.

The issue appears to be novel. Although it is clear that in contract law the government is not bound by the promises or representations of an individual government employee who is not authorized to make such promises, *see, e.g., Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947), neither this court nor the Federal Circuit has directly addressed whether this rule should apply to takings cases.

The cases cited by the parties include many of the seminal cases in federal takings jurisprudence. The case that is factually most similar to the one before us is one not cited by either party: *United States v. North American Transportation & Trade Co.*, 253 U.S. 330, 333 (1920). In that case, an Army General took physical possession of a tract of public land, including plaintiff's mining claim, for use as a military post. *Id.* at 332. Five months later, on the recommendation of the Secretary of War, the President officially set aside the land for military purposes. *Id.* The Court concluded that because the General was not authorized to take the land, the cause of action did not accrue until the Secretary's later recommendation effectively ratified the General's action. *Id.* at 333. The Court noted that the government is liable only if the individual effecting the taking is himself authorized to do so: "In order that the Government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power." *Id.*

*North American* was decided at a time when takings law was analyzed under a contract rubric—a taking was viewed as an implied promise to pay. *See id.* at 335 ("The right to bring this suit against the United States in the Court of Claims is not founded upon the Fifth Amendment . . . but upon the existence of an implied contract entered into by the United States."); *see also*

9

*Schillinger v. United States*, 155 U.S. 163, 167 (1894) ("Some element of contractual liability must lie at the foundation of every [Court of Claims] action."); *United States v. Great Falls Mfg. Co.*, 112 U.S. 654, 656-57 (1884) ("The law will imply a promise to make the required compensation, where property, to which the government asserts no title, is taken, pursuant to an act of congress, as private property to be applied for public uses."). Beginning in 1933, however, the Supreme Court explicitly recognized that takings claims brought under the Tucker Act were founded upon the Fifth Amendment and not on an implied contract. *Jacobs v. United States*, 290 U.S. 13, 16 (1933). Despite this evolution, one of the leading contemporary Federal Circuit cases addressing the authority issue, *Del-Rio Drilling Programs, Inc., v. United States*, 146 F.3d 1358 (Fed. Cir. 1998), begins its analysis by citing *North American* for the proposition that a "compensable taking arises only if the government action in question is authorized." *Id.* at 1362 (citing *North American*, 253 U.S. at 333).

In *Del-Rio*, the government had ceded the surface rights of a tract to an Indian tribe but retained the mineral rights to itself. *Id.* at 1360. The Bureau of Land Management ("BLM") subsequently leased the mineral rights to Del-Rio. Believing that the Tribal Consent Act ("TCA") applied to such mining leases, BLM required Del-Rio to obtain a right-of-way from the Indian tribe before mining the land. *Id.* During the initial years of the lease, the consent was granted without incident. *Id.* In the fifth year, however, the tribe refused to grant the necessary right-of-way, ultimately leading to the lapse of Del-Rio's leases due to disuse. *Id.* at 1360-61.

The pertinent question before the court was whether the BLM officials who determined that the TCA applied were authorized to make decisions regarding the applicability of statutes. *Id.* at 1362 (considering "whether the government conduct at issue was 'authorized,' *i.e.*, whether the alleged invasion of property rights [was] chargeable to the government or [was] an act committed by a government agent acting *ultra vires*"). The court concluded that this determination was "within the scope of their statutorily authorized duties" because "[i]t was part of their job to interpret the statutes and regulations governing federal mining leases." *Id.* at 1363.

The test articulated in *Del-Rio* is whether the act was within the normal scope of an agent's duties: "agents have the requisite authorization if they act within the general scope of their duties." *Id; id.* at 1362-63 (quoting *Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 151 (D.C. Cir. 1983) (subsequent history omitted)) ("A Tucker Act remedy lies if a taking occurs while the

government officer 'is acting within the normal scope of his duties . . . unless Congress has expressed a positive intent to prevent the taking or to exclude government liability.'") (ellipses in original).  The court drew a distinction between conduct that is unauthorized and conduct that is authorized but unlawful for other reasons.  *Id.* at 1362.  In that case, BLM plainly had the authority to regulate mineral leases on Indian lands, and the agents had the authority to interpret and enforce agency regulations.  The agents may have been mistaken in applying the law, but they were acting within the general scope of their duties to interpret the law.  They were not acting so far beyond their duties as to be acting *ultra vires*.

No assertion was made in *Del-Rio* that only higher level officials had the requisite authority.  Thus it was unnecessary for the court to closely parse the particular powers of the BLM agents involved.  We think the thrust of the court's holding, however, dictates that the powers of the particular government actors are relevant.  In takings cases, the ultimate constitutional issue is whether the United States should be bound to purchase the property in question.  Particular individuals could well be acting *ultra vires* in purporting to exercise powers well within the agency's statutory authority.  For example, if the night watchman for the local BLM office had presumed to notify the ranchers in *Del-Rio* that the company should obtain Indian consents, that employee would be acting beyond the scope of his authority, whether or not the ranchers knew of his real position at the agency.  The fact that other BLM officials may have been authorized to take the same actions would not bind the agency, so long as they did not endorse what occurred.

Although the facts in the case at hand are not as egregious as our illustration, we think the inquiry should be the same: were *those particular individual government agents* acting within the scope of their authority?  The question should not be limited to whether the agency could have taken the actions if it had chosen to do so.

We note that the result would be the same in the realm of contracting with the government, where promises or representations made by an unauthorized individual are not binding on the government. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990).  For this reason, an agent's apparent authority is insufficient to modify a contract.  *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007).  As a result, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for

11

the Government." *Trauma Serv.*, 104 F.3d at 1325. Such authority will be implied only where it "is an essential or necessary part of the employee's occupation," and will *not* be implied "where an agency's regulations grant contracting authority to other agency employees." *BioFunction, LLC v. United States*, 92 Fed. Cl. 167, 172 (2010) (citing *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2007)).

This line of contract cases is often traced to *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947). In that case, a farmer was told by the local agent for the government's Federal Crop Insurance program that the program would insure his crop of wheat. *Id.* at 382. When the crop was subsequently destroyed, the government insurer refused to pay, noting that the local agent's assurance had been erroneous. *Id.* The Court agreed with the agency, holding that the local agent's representation was not binding on the government. It cautioned that anyone dealing with a government agent takes the risk that the agent is actually authorized to do or say what he claims:

> [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.

*Id.* at 384.

Here, plaintiff has not persuaded us that different considerations should apply in the context of takings. In takings, as in contracts, a necessary prerequisite is that the government itself has acted. *Hoee v. United States*, 218 U.S. 322, 335 (1910) ("The constitutional prohibition against taking private property for public use without just compensation is directed against the government, and not against individual or public officers."). When a federal official "assumes to act by virtue alone of his office, and without the authority of Congress," his acts do not, "in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of the Congress, cannot create a claim against the government, 'founded upon the Constitution.'" *Id.*

A different result, of course, would open the Treasury to takings claims in which the government, *qua* government, had no intention to act, much less to take property. *See Flexfab, LLC v. United States*, 424 F.3d 1254, 1260 (Fed.

12

Cir. 2005) (noting that the requirement of actual individual authority in contracting "is firmly grounded in the public policy goal of protecting the public treasury from depletion by claims brought pursuant to unauthorized government contracts"). "Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States." *City of El Centro v. United States*, 922, F.2d 816, 820 (Fed. Cir. 1990). In short, absent ratification by an authorized agent, a compensable taking arises only when the action effecting the taking is within the authority of the particular government employee.

## II.   APPLICATION

Having established the appropriate legal rule, application is less problematic. If Mr. Kanae's July 24, 2002 letter was a cease and desist order, it was plainly unauthorized. As discussed above, inspectors at FAA Field Offices were tasked with investigating reported violations within their territory, preparing EIRs documenting their investigations, and, depending on the severity of the violation, either taking administrative enforcement action or recommending legal enforcement action to the appropriate officials at the Regional Office. While Mr. Kanae and Mr. Hamilton were authorized to issue administrative enforcement actions, *e.g.*, letters of correction and warning notices, they were not authorized to issue cease and desist orders. We think that the letter must be read as an order to cease operations:

> This letter is to inform you that the use of the rooftop as a helicopter-pad, at Chuck's Steak House, is considered unsafe, and does not meet the Federal Aviation Administration Advisory Circular 150-5390-2A Heliport Design requirements. This AC is Advisory in nature; however, this office feels that FAR 91.13 will apply to this operation if the AC is not followed. Therefore, this office is requiring that your company immediately cease use of the Chuck's Steak House rooftop for all flight operations.

Def.'s Mot. for Summ. J. Ex. 1. Of the two types of administrative enforcement actions—letters of correction and warning notices—the letter was clearly not the former.[8]   Mr. Kanae's demand goes far beyond merely

---

[8] A letter of correction is used to confirm a previous discussion between the violator and the inspector in which the violator acknowledged the violation and agreed to the appropriate correction. FAA Order 2150.3A § 1104(a).

documenting a minor correction previously agreed upon by the parties. Nor is the letter a warning notice.[9] The letter's final sentence makes clear that it was a requirement to cease use, not merely a warning or reminder of a prior agreement. Its conclusion clearly was an order and was thus beyond the scope of both Mr. Kanae's and Mr. Hamilton's duties.

Nor would it help plaintiff's cause if the letter was, as plaintiff suggests, purely administrative. Indeed, Americopters' immediate reaction, complying with the letter's mandate while protesting its merits, indicates that plaintiff too considered the letter an order. If the letter did not order plaintiff to cease operations, then plaintiff's actions merely were an unwarranted overreaction.

III.   RATIFICATION

Finally, Americopters argues that the FAA implicitly ratified Mr. Kanae's letter by never disavowing it nor telling Americopters that it could resume or continue operations. It further argues that the shutdown order was

---

Each of the five example letters found in FAA Order 2150.3A includes the following language: "we have given consideration to all available facts and concluded that the matter does not warrant legal enforcement action. In lieu of such action we are issuing this letter which will be made a matter of record." *Id.* at Figure 11-3 to 11-7. The example letters likewise all enumerate the agreed-upon corrective action. Here, in contrast, Mr. Kanae's letter made no mention of any discussion or agreement nor did it indicate that the letter was in lieu of legal action.

[9] A warning notice alerts the operator of the violation, requests future compliance, and "[s]tates that the matter has been corrected and/or does not warrant legal enforcement action." FAA Order 2150.3A § 1103(a). The exemplar warning notice contains language similar to that found in the examples of letters of correction:

After a discussion with you concerning this [incident], we have concluded that the matter does not warrant legal enforcement action. In lieu of such action, we are issuing this letter which will be made a matter of record for a period of two years, after which, the record of this matter will be expunged.

*Id.* at Figure 11-1.

14

ratified by the FAA Regional Counsel's eventual response to its inquiries and by the government's legal position taken in the district court. We disagree.

Ratification occurs when one with authority learns of an unauthorized act by his agent or subordinate and subsequently acquiesces to or affirms that act by his conduct. *HNV Cent. River Front Corp. v. United States*, 32 Fed. Cl. 547, 550 (1995) (citing *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994)). The ratifying official "must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt, or acquiesce to the unauthorized action of his subordinate." *Cal. Sand & Gravel, Inc. v. United States*, 22 Cl. Ct. 19, 27-28 (1990).

Although a question of ratification can involve fact questions, *see Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (citing *United States v. Beebe*, 180 U.S. 343, 354 (1901)), there are no factual disagreements here and it is clear from the record that the FAA never ratified the shutdown order. The September 19, 2002 letter from the FAA's Regional Counsel certainly said nothing to adopt or affirm Mr. Kanae's earlier letter. *See* Def.'s Mot. for Summ. J. Ex. 4. Rather, it explicitly listed the types of FAA employees who were authorized to issue cease and desist orders—all of whom are attorneys—and noted that no such order was issued to Americopters. Likewise, the government's subsequent arguments before the district court, where litigants are permitted to argue in the alternative, did not ratify Mr. Kanae's letter.

At no time did the FAA ratify Mr. Kanae's unauthorized letter. Accordingly, the action causing the alleged taking was not authorized and, therefore, not compensable.

CONCLUSION

For the reasons stated above, we grant defendant's motion for summary judgment and deny plaintiff's cross-motion for partial summary judgment. The clerk is directed to enter judgment for defendant. No costs.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge